UNITED STATES *v.* BRYANT & HEFFERNAN, INC. (No. 4349)[1]

United States Court of Customs and Patent Appeals, December 1, 1941

*Charles D. Lawrence*, Acting Assistant Attorney General (*Joseph F. Donohue,* special attorney, of counsel), for the United States.
*Tompkins & Tompkins* (*Allerton deC. Tompkins*, of counsel) for appellee.

[Oral argument October 10, 1941, by Mr. Lawrence and Mr. J. Stuart Tompkins]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

JACKSON, Judge, delivered the opinion of the court:

This is an appeal by the Government from a judgment of the United States Customs Court, Third Division, sustaining the protest of appellee in a suit to recover certain customs duties alleged to have been illegally assessed and collected by the collector of customs at the port of New York on certain imported merchandise invoiced as "treated coal."

The collector classified the merchandise as dutiable under paragraph 216 of the Tariff Act of 1930 as amended by the reciprocal trade agreement between the United States of America and the French Republic, T. D. 48316, 69 Treas. Dec. 853.

[1] C. A. D. 187.

Appellee protested the classification and assessment, claiming the merchandise to be properly free of duty under paragraph 1650 of said act, or, alternatively, dutiable at 27½ per-centum ad valorem under paragraph 372, at 25 per centum ad valorem under paragraph 5, or at 20 per centum ad valorem under paragraph 1558.

The trial court in its decision weighed the issue as between paragraphs 1650 and 216 only and held the "treated coal" to be entitled to free entry as "coal * * * bituminous" under said paragraph 1650.

Since we are of opinion that the merchandise is not coal in a tariff sense and that the classification by the collector was correct, it will be unnecessary to discuss the alternate claims in the protest of appellee.

The pertinent parts of paragraphs 1650 and 216 are as follows:

PAR. 1650. Coal, anthracite, semianthracite, bituminous, semibituminous, culm, slack, and shale; coke; compositions used for fuel in which coal or coal dust is the component material of chief value, whether in briquets or other form: * * *

PAR. 216. * * * articles or wares composed wholly or in part of carbon or graphite, wholly or in part manufactured, not specially provided for, 45 per centum ad valorem.

The said trade agreement lowered the duty under the above-quoted provision of paragraph 216 from 45 to 30 per centum ad valorem.

At the trial, two witnesses testified for appellee. The Government offered no evidence.

The record discloses that appellee is the customs broker for the actual importer, the Permutit Co., which is engaged in the business of "water conditioning and power plant equipment," and that the "treated coal" is used as a "water softener." Water softening as therein described is a process wherein, when the "treated coal" and certain water are brought into contact the sodium ions contained in the merchandise are substituted for and take the place of the calcium and magnesium ions contained in the water. In other words it apparently makes "hard" water "soft."

It appears that the imported merchandise is made from regular bituminous coal and that the coal contains free carbon. The coal is first crushed and screened to reduce it in size to fine particles. The coal so screened is then placed in a revolving drum into which is passed sulphur trioxide gas for some hours. After this process, the content of the drum is washed with plain water or water containing soda ash. It is then dried and ready for use as a water softener. Washing is done "To remove the gases; sulphuric acid adhering to the coal."

The testimony also shows that the merchandise has not lost its fuel properties by reason of the aforesaid treatment. It can be and has been burned as bituminous coal can be burned.

The record also shows that when the coal particles are subjected to the sulphur trioxide treatment a chemical reaction occurs which has the effect of changing the ratio of the elements of the coal. While the process to which the coal particles are subjected does not take from the coal any of its elements, it adds by chemical union to the sulphur and oxygen content thereof.

It appears that the coal, treated as above set out, possesses different chemical properties than does the coal before treatment and that when in contact with "raw water," a chemical action takes place in which the water is "softened" as above mentioned. Regular crushed and screened bituminous coal will not "soften" water.

The contentions of the parties are set out in the decision of the trial court as follows:

The plaintiff contends that the term "coal" as found in paragraph 1650 is without qualification or limitation and therefore embraces every kind and class of merchandise properly referable thereto, either directly or as a species the genus of which is included within the tariff nomenclature, citing *Schade* v. *United States*, 5 Ct. Cust. Appls. 465, T. D. 35002, and relying upon the cases of *Tower* v. *United States*, C. D. 204, and *Allen Forwarding Co.* v. *United States*, Abstract 27728.

The Government, upon the other hand, contends that as the coal has been ground and screened its physical properties are changed, and the gas treatment transforms its chemical properties so that the resulting product consists of a relatively uniform granular mass with the basic chemical structure altered from that of coal and having a new use. As authority for its contention, the Government cites *United States* v. *Meier*, 136 Fed. 764; *Holt* v. *United States*, Abstract 42312; *Vandegrift* v. *United States*, T. D. 38521; *Stone* v. *United States*, 7 Ct. Cust. Appls. 173, T. D. 36492; *Allen Forwarding Co.* v. *United States*, Abstract 27728; and *Salomon* v. *United States*, 26 C. C. P. A. 302, C. A. D. 32.

The trial court in its decision considered the cases cited by the parties and ordered judgment to be entered in favor of appellee, basing its decision upon the case of *Balfour, Guthrie & Co., Ltd.* v. *United States*, 5 Cust. Ct. 180, C. D. 397.

It seems that the judgment of the court below was predicated largely upon its conclusion that the above-mentioned change in ratio of the coal elements does not cause the coal to become less useful as a fuel and that the treated coal has been so used. We do not think that such conclusion is warranted by the evidence. The testimony in the record bearing upon the use of the involved merchandise as a fuel is meager and in view of the fact that the value of the treated coal, as shown in the official papers, is approximately $158 per ton, we think that its fuel use must have been fugitive, experimental or made under stress of very unusual circumstances. The following is the only testimony on this phase of the case: One of the witnesses, on direct examination, when asked "Could one use the imported treated coal as a fuel?" answered, "Yes." The other witness, on direct examination testified as follows:

Q. Is that [treated coal] in your opinion a kind of coal?—A. Yes.

Q. Can the imported "treated coal" be used as a fuel?—A. Yes.

Q. Have you seen it so used?—A. Yes.

Upon cross-examination it was developed that the merchandise is too expensive to be ordinarily used as fuel. The record might have been clarified by developing where, how and under what circumstances the witness saw the treated coal, such as that imported, used as a fuel.

We hold that in a tariff sense the imported merchandise is not a form or kind of coal. It is more than coal. It is not a natural product but is an article that has been manufactured from coal for a specific use for which coal in any of its natural forms is not suitable. It apparently has had added to it more sulphur and oxygen than is to be found in regular bituminous coal. It possesses chemical properties not found in coal. It is made for and dedicated to the specific use of "softening" water. Simply because the merchandise can be or has been burned as coal, under some circumstances not shown, is not sufficient to justify its being classified for duty purposes as coal. Combustibility alone cannot be considered as determinative of the classification of the involved merchandise.

Appellee contends that the coal specified in paragraph 1650 is not limited to fuel coal. In our opinion, paragraph 1650 is a fuel paragraph. In its first part it provides for coal, in all of its forms or varities, ordinarily commercially suitable for use as fuel. The remaining part of the paragraph provides for articles derived from coal and ordinarily commercially suitable for fuel use. Appellee bases in part its contention upon its statement in the brief that culm and slack are defined in the dictionaries as coal refuse or coal dust often containing slate and dirt and therefore not desirable as fuel. In the Funk & Wagnalls New Standard Dictionary we find culm and slack defined as follows:

Culm—1. [Pennsylvania] Coal refuse and dust collected about anthracite mines or at shipping points.

They would inquire as to the probable success of engines that would consume culm. Brower in *Atlantic Monthly*, June, 1889. p. 720.

2. An anthracite coal of inferior quality.

Slack—Small coal; coal dirt and screenings.

Accordingly it is clear that the culm and slack provided for in paragraph 1650 are forms of fuel.

Further in support of the above contention, appellee urges that "shale" as contained in paragraph 1650 is not coal at all, citing general definitions of the word from the Century Dictionary, Webster's New International and the New Standard Dictionaries. It is true that under its broad definition the word "shale" may be an article other than coal. But it is equally true that there is a coal shale. According to the New Standard Dictionary shale may be: "bituminous shale, a shale containing hydrocarbons or bituminous material." Cannel coal

is a variety of bituminous coal which "graduates into oil-producing coaly shales, the more compact of which it much resembles." Dana's A Textbook of Minerology, (1900) p. 546. In Tariff Information Surveys, 1921, prepared by the United States Tariff Commission for the Committee on Ways and Means of the Congress it is stated on page 10 of the Survey of Coal and Coke that:

Shale is an indurated clay consolidated chiefly by the pressure of overlying sediments and with a thinly bedded structure. It is commonly found associated with coal seams. The gray or black color of shale is usually caused by the presence of carbonaceous matter, and there may be a notable quantity of bitumen. When there is sufficient bitumen present so that the mineral crackles and blazes in the fire, emitting a black smoke and bituminous odor, it is known as bitumen shale.

We are convinced that the "shale" provided for in paragraph 1650 is a form of coal and that the said paragraph is a fuel paragraph, and the forms of coal there set out are natural products of the earth.

Since, as we have held above, the imported merchandise is not coal in a tariff sense and therefore not provided for in paragraph 1650, we are of the opinion that it is properly dutiable under paragraph 216 as classified by the collector for the reason that it is an article "composed * * * in part of carbon * * * wholly * * * manufacture, not specially provided for * * *." We think that in this case it is proper to term the imported merchandise "an article" under the broad definition thereof. United States v. Eimer & Amend, 28 C. C. P. A. (Customs) 10, C. A. D. 117. Appellee makes no contention to the contrary. Because it is a manufactured article, the "treated coal," largely composed of free carbon and not specially provided for in the tariff act, certainly must fall within the purview of paragraph 216. We have no doubt that all such articles are to be there included for classification. United States v. Buhring Water Purifying Co., 22 C. C. P. A. (Customs) 410, T. D. 47403, 66 Treas. Dec. 735.

Among the cases cited by appellee, the case of C. J. Tower & Sons v. United States, 3 Cust. Ct. 67, C. D. 204, is particularly relied upon to sustain its contention that the treatment of the screened coal herein does not exclude it from paragraph 1650. In that case, as in this case, the competing paragraphs 1650 and 216 were involved. The merchandise was described in the entry as "Bulk Petroleum Coke." It was classified by the collector under the same portion of paragraph 216 as is here under consideration, and was claimed by the importer to be properly free of duty as "coke" under paragraph 1650. The merchandise in that case was made by subjecting petroleum coke to a high heat in order to eliminate moisture and volatile matter. The testimony disclosed that it was known as "calcined petroleum Coke" and used in the manufacture of dry batteries. The court sustained the protest, holding that the imported merchandise was

entitled to free entry under the provision of paragraph 1650 for "coke" as claimed in the protest. No appeal was taken from the judgment. The court in its decision stated as follows:

* * * It conclusively appears that the merchandise which was placed into the furnace was coke and that the merchandise which came out therefrom and forms the subject of this protest was still coke, although it had been advanced by having been calcined by eliminating therefrom moisture and volatile material. The evidence indicates that no new article or ware was produced by the calcining operation but that instead the material, coke, was advanced in condition, and, presumably, value.

Coke is a solid product obtained by heating coal (in practice, bituminous coal) in a furnace without access of air. When coal is subjected to intentional and controlled distillation, the volatile matter and moisture are driven off and the residue consisting of fixed carbon and ash-forming substances is commercial coke. The solid matter remaining after the refining of petroleum by the "cracking" process is a form of coke. Van Nostrand's Scientific Encyclopedia, p. 281. The merchandise in that case was used in the manufacture of dry batteries. We cannot tell from the decision therein whether or not the coke there was commercially suitable for use as a fuel. If it appeared it was not commercially suitable for use as fuel we could not approve such decision.

The *Balfour, Guthrie* case, *supra*, and the cases cited therein as relied upon by the trial court, as well as the cases cited by appellee have received our careful attention, but since the merchandise involved in those cases is radically different from that involved here, and because the issues there are not comparable to that presented in this case it would serve no useful purpose to discuss those cases.

Since we are of opinion that the imported merchandise is not coal in a tariff sense and therefore not provided for in paragraph 1650, and that it is properly dutiable under paragraph 216 as classified by the collector because it is an article "composed * * * in part of carbon * * * wholly * * * manufactured, not specially provided for * * *," the judgment of the United States Customs Court is *reversed*.